FLEMING et al. v. LAWS.

(Circuit Court of Appeals, Fourth Circuit. October 10, 1911.)

No. 1,010.

1. COURTS (§ 323*)—JURISDICTION OF FEDERAL COURTS—CITIZENSHIP OF PARTY.
Evidence *held* sufficient to establish that a complainant was a citizen of New Jersey, and merely had a temporary domicile in West Virginia, on an issue as to diversity of citizenship.

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 323.*

Diverse citizenship as a ground of federal jurisdiction see notes to Shipp v. Williams, 106 C. C. A. 249; Mason v. Dullagham, 27 C. C. A. 298.]

2. COURTS (§ 371*)—JURISDICTION—USURY.
Under Code. W. Va. 1906, § 3432, which gives to a borrower the right to invoke the aid of a court of equity to compel discovery when it is alleged that usury has been reserved by the lender, a federal court in that state has jurisdiction in equity of a suit by a borrower to compel credit on his unpaid notes of usury alleged to have been paid, where the requisite diversity of citizenship exists.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 907, 972–976; Dec. Dig. § 371.*]

3. USURY (§ 117*)—EVIDENCE—MEASURE OF PROOF REQUIRED.
An allegation of usury must be proved by clear and satisfactory evidence.

[Ed. Note.—For other cases, see Usury, Cent. Dig. §§ 328–340; Dec. Dig. § 117.*]

4. USURY (§ 117*)—EVIDENCE—SUFFICIENCY.
Evidence considered, and *held* insufficient to sustain an allegation that a transfer of railroad stock by complainant to defendant was a device to cover usurious interest on a loan.

[Ed. Note.—For other cases, see Usury, Cent. Dig. §§ 328–340; Dec. Dig. § 117.*]

Appeal from the Circuit Court of the United States for the Northern District of West Virginia, at Philippi.

Suit in equity by William M. Laws against Thomas W. Fleming and Allison S. Fleming. Decree for complainant (177 Fed. 450), and defendants appeal. Reversed.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Reese Blizzard (John Marshall, on the brief), for appellants.

E. M. Showalter (Harry Shaw and L. S. Schwenck, on the brief), for appellee.

Before GOFF and PRITCHARD, Circuit Judges, and CONNOR, District Judge.

CONNOR, District Judge. Appellee, William M. Laws, alleging that he is a citizen of the state of New Jersey, exhibited his bill in equity in the Circuit Court of the United States for the Northern District of West Virginia against appellants, citizens of the state of West Virginia, in which he alleges: That on the 12th day of October, 1908, he entered into a contract with appellant Thos. W. Fleming, by the terms of which said Fleming agreed to loan to him the sum of $18,000 and to indorse other notes to enable him to borrow the additional sum of $12,000, making in all the sum of $30,000, of which amount he was in great need, in prosecuting the construction of the Fairmont & Mannington Railroad, of which said Fleming was president. That, in consideration of securing said loan and indorsement, appellee agreed to execute to Fleming his note for the sum of $23,000, being the amount then advanced, $18,000, and $5,000, a note which said Fleming then held against appellee. That he also agreed to deposit with said Fleming, as collateral security for the note of $23,000 and his indorsement of a note for $12,000, certain bonds of said railroad company, and to transfer to said Fleming 1,500 shares of the capital stock of said company of the par value of $100 each, and of the actual value of $30,000. That the transfer of said stock "was, and is, the payment to said Fleming, to the extent of the value thereof, an amount in excess of the lawful rate of interest on said sum of $23,000, and that the same is usurious." He further alleges that appellant Thos. W. Fleming has transferred and assigned to appellant Allison S. Fleming, without any valuable consideration and with full notice of the consideration upon which they were transferred to him, the said shares of stock. That said note of $23,000 was renewed at maturity and the renewal note is not now due, but that he is ready, willing, and able to pay same. He further alleges that, notwithstanding his promise and agreement, said Thos. W. Fleming has refused to indorse his note for the sum of $12,000, or any other sum; that appellant Thos. W. Fleming is attempting to negotiate said note, and, unless enjoined, will sell and transfer same to some innocent holder without notice of appellee's right to have the value of the said shares of stock credited thereon. He prays that an injunction issue restraining appellants from transferring or negotiating said note, the bonds deposited as collateral security therefor, or the said shares of stock; that the value of said stock be credited on said note, etc. Appellants demurred, and, following a decree overruling the demurrer, answered, denying that said shares of stock were transferred to appellee in consideration of the loan of money, or that appellant Thos. W. Fleming promised or agreed to indorse appellee's note for $12,000. He sets out the terms of said transaction as follows: That prior to October, 1908, he held appellee's note, overdue, for the sum of $5,000. That, in addition

thereto, he was indorser for appellee on two other notes for the sums of $5,000 and $2,600, respectively. To indemnify himself against loss on account thereof, he held 22 of the bonds of said railroad company. That on said day he agreed to loan appellee $18,000 and appellee agreed to execute his note for $23,000, being the aggregate amounts of said loan and the note of $5,000. He denies that he promised to indorse any other note or notes for appellee. That, as collateral security for said note of $23,000, appellee agreed to deposit certain bonds of the railroad company. That appellee was indebted to him in a large sum for services rendered by appellant. That, independent of, and unconnected with, the loan, appellee agreed to transfer to him 1,500 shares of the stock of said railroad company in settlement of amount due him for services. The actual value of said stock was very small and uncertain. He admitted the transfer of the stock to appellant Allison S. Fleming. An injunction issued restraining appellant Thos. W. Fleming from negotiating the note and both appellants from transferring, or otherwise disposing of, the said stock. Appellee having deposited with the court the amount of the note for $23,000 and interest, a consent order was entered that appellants file with the court, for delivery to appellee, the bonds hypothecated for the security of said note, and the certificate of stock in controversy "to abide any decision of the court to be hereafter rendered." The cause was heard upon depositions.

An examination of the testimony shows the following facts, in regard to which there is no substantial controversy: The Fairmont & Mannington Railroad Company was organized by appellant Thos. W. Fleming and others. They were voted, by the company, $93,000 of the capital stock for their compensation as promoters, and Fleming became one of a syndicate which undertook to secure the rights of way for which this syndicate was to receive $24,000 of the bonds, subsequently increased to $34,000. In addition to this, an underwriting syndicate was formed to take $100,000 worth of bonds in denominations of $1,000 each at $850 per bond, and for each bond so taken $3,000 worth of stock was to issue to the person taking the bond. Thos. W. Fleming, under this arrangement, subscribed for ten bonds, for five of which he paid. In January, 1906, a contract was made by the company with one Brown, whereby he was to receive $423,000 of bonds and 9,900 shares of stock in consideration of his building and equipping the road from Fairmont to Mannington, a distance of 14½ miles. Brown failed to perform his contract, whereupon other parties formed the Buffalo Construction Company and another contract was entered into between the railroad company and the construction company for the completion of Brown's contract. Appellee, Laws, was the substantial owner of the construction company's interest in the contract, and, in its name, undertook to complete the road. He became the owner of the bonds and stock issued to Brown, not disposed of by him. The total authorized capital of the railroad company is $1,000,000 and bond issue $600,000. Thos. W. Fleming is president of the company and Allison S. Fleming secretary and treas-

urer. Appellee, Laws, in his deposition thus states the transaction, out of which this controversy grew:

"Some time in October, 1909, it became necessary for me to raise about $30,000. I went to New York to borrow the money from a banker. He required of me $100,000 bonus of stock for getting the loan. I came down to Fairmont. Mr. Thos. W. Fleming and A. S. Fleming and, I think, some other gentlemen, walked out over the lines. During our walk I told Mr. Thos. W. Fleming of my effort to raise the money, and that this party wanted $100,000 bonus of stock, and he felt very indignant that I had been held up to that extent. We came back and went into the office of Mr. A. S. Fleming. Thos. W. Fleming called me into his office, and said he had talked it over with his son, and he had agreed to loan me a part of it, to the extent of $18,000 cash. I told him that was very nice, and he said: 'Laws, how about the stock?' I said: 'I have it.' He says: 'Can't you make it $150,000?' I told him that was a very large sum, but, in view of his helping me to raise the $30,000, I finally consented to give him $150,000 worth of stock. He said that he would put $18,000 to my credit in bank to-morrow. I had previously borrowed $5,000 from him, which was overdue. He asked me if I would not make the note include the $5,000, making it $23,000. I made no objection to it. This was on October 12, 1908. I gave him the note for $23,000."

He further says:

"I asked Mr. Fleming to loan me $30,000. Mr. Fleming told me he would do it; that he himself would loan me $18,000. Then he asked me to give him the stock. I met Mr. Fleming in Philadelphia, and asked him to indorse the paper. 'What paper?' Two notes I had for $5,000 each. He said to me: 'Where is the stock?' I said: 'I have it in my pocket.' He said to me to deliver the stock to A. S. Fleming, and he would receipt for him, and 'I will attend to this matter when I go to Fairmont.' This was some time in December or November. 'That was the only matter I went to see him in Philadelphia on.' He never indorsed the $12,000 or any part of it."

After appellee saw Fleming in Philadelphia he delivered the stock. Appellee denies that at the time of the loan of $18,000 and the promise to indorse for $12,000 additional any reference was made to the indorsement of $5,000 and $2,600 notes, or that they were taken into consideration. He admits the performance of services by appellant, but insists that they were rendered to the company, of which he was president and in which he was interested, and not to him personally. A paper was shown to appellee purporting to be a copy of the receipt given by T. W. Fleming for the bonds which he says, "he thinks is a copy." It was afterwards identified by Thos. W. Fleming as correct and introduced in evidence (Exhibit No. 1). This receipt recites that Fleming holds $50,000 of the Fairmont & Mannington Railroad Company bonds (giving serial numbers) as—

"collateral security of a note given to me payable six months after date, with interest from date by W. M. Laws, dated October 12, 1908, for the sum of $23,000 and a note of W. M. Laws payable to the First National Bank of Fairmont for $5,000 on which I am indorser—also another note in the said bank for the sum of $2,600 executed by W. M. Laws on which I am indorser. The above bonds are to be surrendered to the order of said Laws upon the payment of said notes by him. It was agreed that said $23,000 should be renewed when the same became due for an additional period of six months, but Laws to retain the privilege of anticipating the payment thereof."

It seems that at the time of the execution of the $23,000 note Fleming held 22 of the bonds as collateral for the amount due and the indorsements then outstanding. Appellee says:

"I contend that Mr. Fleming made a contract with me to raise $30,000 either by indorsement or by cash for which I was to give him 1,500 shares of stock of the Fairmont & Mannington Railroad Company, and I was to pay him 6 per cent. interest."

He says that the conversation in which the contract was made was between Thos. W. Fleming and himself in one room of A. S. Fleming's offices. No one else was present. "After he had agreed to do that, we walked back into Mr. A. S. Fleming's office, and talked over the general situation." A number of letters from appellee to appellant Thos. W. Fleming were introduced. None of them refer to the transfer of the stock or the terms of the contract. Many of them relate to services rendered by Thos. W. Fleming regarding the indorsement of other notes, construction, etc., of the road. On December 17, 1908, Laws writes Fleming from Jersey City:

"I wrote you this afternoon as well as telegraphed. Money seems very hard to get here unless you have regular stock exchange collateral. I saw Mr. C. W. Watson this afternoon and he asked me if you would indorse paper. I told him I did not know. He said that the bank knew that you were indorsing for the other bank, so they wanted you to indorse for the Bank of Fairmont. He said if you would indorse there would not be any trouble about getting the money. * * * Mr. Koen said if you would indorse my note for $5,000 he would let me have the money. This additional ten will make three more than you agreed to do, but you will have eight additional bonds and it will help out things materially. * * *"

On the same day he writes Fleming, saying, among other things not material to this controversy:

"I inclose herewith note made to your order for $5,000 payable to the Bank of Fairmont. Will you kindly indorse this and have it discounted at the Bank of Fairmont, etc."

Thos. W. Fleming in his deposition gives the following account of the transaction:

"On Saturday, the 10th day of October, 1908, we had fixed on that day to run cars from Fairmont to Farmington. Mr. Laws came here on that day. Mr. Laws, my son, Allison S. Fleming, and myself went to Farmington. We walked back from Farmington over the line of the road, inspecting it. * * * During our walk and conversation Mr. Laws stated that it was necessary for him to raise some money, and that he had applied to Mr. C. W. Watson in New York City to assist him. Mr. Laws stated that Mr. Watson said that he could secure him this money, provided he would get me to indorse his note, and that Mr. Watson had required for his services in securing him this money 1,000 shares of stock, of the par value of $100 each of the railroad company. I said that was certainly an exorbitant demand, for me to indorse paper and them get the benefits of it. Nothing more was said, I believe, upon that subject at that time. We continued to discuss the construction of the road and then the car came along, and we took a car from that point in to Fairmont, reaching here near 12 o'clock. My son and I went home to luncheon and talked this matter over. We then met again. Mr. Laws, my son, and myself met again in this room, the office of A. S. Fleming. It was then possibly a quarter after or half past 3 o'clock in the afternoon. Mr. H. E. Moran, an attorney, was in this room at the time looking over some cases in my son's law library, and we three, Mr. Laws, my son, and myself, went into the next room—the room occupied by myself. I said to Mr. Laws: 'I have been thinking about the indorsement that you asked me for this morning, and I have decided to make you this proposition: On the 30th day of November, 1907, I loaned you $5,000 at the request of your agent, Shrewsbury Miller, which money was for the purpose of paying

Mr. Queen an order to keep the men from going on a strike. I indorsed for you in the First National Bank of Fairmont a note of $5,000 and also indorsed a note of $2,600 for you, making a total of $12,000, for which you gave me 22 bonds of the Fairmont & Mannington Railroad Company of $1,000 each as collateral security. The note for $5,000 given me is now some eight months past due, and on which there is $200 and some odd cents interest. If you will pay me the interest on that note, I have at this time $18,000 cash laying in the Bank of Fairmont. If you will give me your note for $23,000, including the $5,000 previously loaned you with the $5,000 indorsement in the First National Bank, and the indorsement of the $2,600 note, which makes a total of $30,000, I will agree to loan you the $18,000 for six months, with the privilege of one renewal, at 6 per cent., and I will also renew the $5,000 note and the $2,600 note in the First National Bank, you giving me 28 additional bonds to secure me for the additional loan;' to which Mr. Laws replied that he would give me an order on Mr. James R. Linn for 28 additional bonds. I then said to Mr. Laws, 'Mr. Laws, you said to me in June, 1907, in New York City, that you would depend upon me to assist you in this undertaking; that you had never been in this country, and was largely depending upon me to assist you, and that you would see that I was properly cared for.' I said: 'I have been indorsing paper for you and have been doing a great deal of work for you and have given my entire time on this road, looking after its construction and aiding you in every possible way, and I think now is a good time for us to have an understanding with reference to what I am to be paid for my services.' He wanted to know if I would be willing to accept $100,000 of stock. I said that I should have $150,000 worth of stock; that the stock so far as the value was concerned was of no value; but I felt that I had rendered sufficient services that I was entitled to that much stock. Mr. Laws said: 'All right, Mr. Fleming, I will agree to give you $150,000 worth of this stock.' We then left that room and came back into this room; Mr. Moran in the meantime having left this room. We talked it over there and said it was then after banking hours."

He testifies that Laws came to him December, 1908, at the Belleview Stratford Hotel—he was on his way to Fairmont.

"He said: 'Mr. Fleming, I have that stock for you.' I said, 'Are you going to Fairmont?' He said he was. I then told him to take the stock and deliver it to my son."

He denies that he agreed to indorse for Laws, but he did agree to renew the indorsement on the $5,000 and the $2,600 notes. He further says that, when in Philadelphia, Laws said:

"'Would you have any objection to indorsing an additional $10,000 if I can secure Mr. J. T. Koen's consent to go on the notes with you?' I said: 'You go to Fairmont and see Mr. Koen. I will be home in a few days, and, if Mr. Koen will consent to, I will do so.' Mr. Koen declined to do so."

He denies that Laws asked him at any time to indorse his note for $12,000. The note for $23,000 was renewed at maturity. The $5,000 and $2,600 notes were paid, and Fleming surrendered 12 of the bonds. He testified to alleged services rendered to Laws, in connection with the construction of the road, prior indorsements of notes, etc. Thus the parties to the transaction, differ in toto in regard to the alleged agreement of Fleming to indorse notes for Laws to the extent of $12,000 and in respect to the consideration which moved Laws to transfer the stock to Fleming.

[1-3] Before proceeding to discuss the evidence bearing upon this conflicting attitude of the parties, it will be well to dispose of the two preliminary questions raised by appellants and decided by the learned judge below. Appellants insist that upon the evidence taken

the court should have found as a fact that appellee was not at the time the bill was filed a citizen and inhabitant of New Jersey. Without discussing the testimony, we concur in the finding of the judge for the reasons set out in the opinion in the record. Appellants demurred for that "the bill does not show, upon its face, any such cause of action as is cognizable in a court of equity." The demurrer was overruled, and the question again raised upon the final hearing. The learned judge below was of the opinion that the point was waived by the consent order. He was also of the opinion that as the West Virginia statute (Code 1906, § 3432) gave to the appellee the right to invoke the aid of a court of equity to compel discovery, when it is alleged that usury has been reserved for the loan of money by "shifts relative to such loan," etc., jurisdiction is vested in the federal court on the equity side where the element of diverse citizenship exists. We concur with the conclusion reached by the judge below and sustain the jurisdiction. We are thus brought to a consideration of the evidence, relied upon by appellee, to sustain the allegations of his bill which are fully met by the answer under oath. In the absence of any evidence of usury upon the face of the contract, the note, or the papers executed cotemporaneously therewith, appellee relies upon parol testimony to establish his charge of usury. The courts have always, and uniformly, held that the allegation of usury must be proven by clear and satisfactory evidence. By reason of the heavy penalties formerly imposed upon the usurer and the forfeitures incurred, it has been held that the allegation must be sustained by testimony of probative force which excludes all reasonable doubt. The Court of Chancery of New Jersey, as late as 1871, held "that the evidence must be clear and cogent." Morris v. Taylor, 22 N. J. Eq. 438. The Vice Chancellor quotes, with approval, the language of the court in Patent Tanning Company v. Turner, 14 N. J. Eq. 326:

"It is not enough that the circumstances proved render it highly probable that the transaction was usurious. The usury must be proved, not left to conjecture."

And, in Conover v. Van Mater, 18 N. J. Eq. 481, it is said:

"That, while the act (1864) lessened the severity of the penalty, it still worked a forfeiture, and that the same rule of evidence must still apply to such defense, as had always, both at law and in equity, been adopted in case of penalties."

In Morris v. Taylor, supra, it is said:

"The facts in regard to the true consideration of the mortgages are exclusively within the knowledge of the parties. They contradicted each other in direct and irreconcilable terms. Prior to the giving of each mortgage, there had been mutual dealings between them covering considerable time, and involving the particulars of cash loans, checks, notes," etc.

After a careful examination of the evidence, the learned chancellor holds that the allegation of usury was not established. In Brockenbrough's Ex'rs v. Spindle's Adm'rs, 17 Grat. (Va.) 21, a bill was filed in equity alleging usury. The court directed an issue to be sent to a jury to decide the controverted allegation. The jury, on the law

side of the court, found that the transaction was usurious. The verdict was set aside and the issue submitted to a second jury with a similar result. The court refused to set aside the second verdict, and certified the finding to the court of equity. Judge Moncure, in a very interesting opinion, construing the statute under which the bill was filed, discussed the evidence, saying:

"That strong and clear proof should be required to convict a man of usury, and subject him to all the consequences of such conviction, is a proposition which rests on the plainest principles of law, and can require no citation of authority for its support. The usury ought to be proved beyond a rational doubt to the contrary."

After a careful analysis of the testimony, the learned judge concludes that the verdict should be set aside with direction to the court upon a third trial, "should the evidence be the same substantially," to direct the jury to find that the transaction was not usurious. So it is held in Bank v. Waggener, 9 Pet. 378, 9 L. Ed. 163:

"When the contract on its face is for legal interest only, then it must be proved that there was some corrupt agreement, or device or shift, to cover usury, and that it was in the full contemplation of the parties."

[4] It will be observed that while appellee testifies that, by the terms of the contract, appellant Thos. W. Fleming was under a binding contractual obligation to indorse his note for $12,000, and that, without excuse or justification, he refused to do so, and thereby subjected himself to an action at law for damages, the sole ground upon which relief is prayed in this court is that the transfer of the stock was to the extent of its value a payment of an amount for the loan in excess of the legal rate of interest. The truth of the allegation in respect to the indorsement of the note is material in ascertaining the weight to be attached to appellee's testimony regarding the allegation of usury. If he has not sustained the allegation, in respect to which he testifies with the same certainty as he does to the consideration upon which the transfer of the stock was made, his failure to do so weighs against him in respect to the charge of usury. It is difficult to understand why, when appellee meets appellant in Philadelphia and asks him to indorse two notes for $5,000 each, he is content to be put off with the statement by Fleming that he would attend to it when he went to Fairmont, and, although he refused to indorse these notes, appellee at no time thereafter demands that he do so by reason of an alleged promise. The only reference which we find by appellee to such promise is in the letter of December 17, 1908, in which he says:

"I saw C. W. Watson this afternoon, and he asked me if you would indorse the paper. I told him I did not know. * * * Mr. Koen said if you would indorse my note for $5,000 he would let me have the money. This additional ten will make three more than you agreed to do, but you will have eight additional bonds and it will help out things quite materially."

No other reference is made to the alleged promise to indorse any notes. Fleming says that:

"Appellee, when in Philadelphia, said: 'Would you have any objection to indorsing an additional $10,000 if I can secure J. T. Koen's consent to go on the notes with you?' And I said: 'You go to Fairmont and see Mr. Koen. I will be home in a few days, and, if Mr. Koen will consent to, I will do so.'"

Mr. Koen corroborates Fleming. He says that appellee came to him in December with two notes of $5,000 each, and asked him to indorse with T. W. Fleming; that he declined to do so; that appellee said Fleming would indorse with him. A. S. Fleming testifies that he was present at the time the contract was made between Thos. W. Fleming and appellee, and that nothing was said about indorsing notes for $12,000. The receipt which Fleming gave appellee for the bonds, as collateral, sets out the purpose for which they were deposited, makes no reference to the indorsement of any notes, but does recite the notes for $5,000 and $2,600, upon which Fleming was at that time indorser, and expressly provides that "the above are to be surrendered to the order of said Laws upon the payment of said notes by him"; that is, the note for $23,000 and those for $5,000 and $2,600 It is difficult to understand why, if Fleming demanded the deposit of collaterals for the notes recited in the receipt, he at the same time came under obligation to indorse for $12,000 additional, without any security whatever. Again, the reference to the sum of $30,600 is explained by Fleming, who testifies that he said to appellee that the loan of $18,000 and the note of $5,000, with the notes upon which he was then indorser, amounted to $30,600. He held 22 of the bonds as collateral for the amount for which he was bound by his indorsement. Appellee gave him 28 bonds additional to cover the loan then made and the indorsements then outstanding. If Fleming was to indorse for $12,000 in addition, his total indebtedness and liability would aggregate $42,600, for which he had only $50,000 bonds which had been taken by appellee at $850 each—$42,500. A. S. Fleming says that, for the purpose of collateral security, the bonds are estimated at 60 cents. Regarding the testimony of the parties to the contract, or, rather, treating the assertion by one and the denial by the other as of equal probative weight and resorting to their conduct and declarations subsequent to the time at which the contract was made and the corroboratory parol evidence, we reach the conclusion that appellee has failed to establish his allegation that appellant at the time of, and as a part of, the contract, promised to indorse his notes to the extent of $12,000.

We are thus brought to the determinative question in the cause: Were the shares of stock transferred to appellant in consideration of, and as a bonus for, the loan of $18,000, or, as alleged, were said bonds "a payment to said Fleming to the extent of the value thereof an amount in excess of the lawful rate of interest on said sum?" In seeking an answer to this question, it becomes material to inquire what, if any, consideration passed for the transfer of the stock—certainly it was not intended by either as a gift. Appellant insists that the transfer was made in execution and performance of a promise by appellee "to take care of him" for services rendered appellee in indorsing paper, doing work, and giving his time looking after the construction and aiding in the performance of his contract in the construction of the road. Appellee, while not denying that appellant had performed services as alleged, insists that such services were performed for the corporation, in which appellant was financially interested, and not for himself personally. Just here there is an irreconcilable conflict be-

tween the parties. Appellee insists that no other person was present when the contract was made. Appellant A. S. Fleming testifies: That he was present and heard the conversation. That it was in one room of his office, and that—

"immediately after the close of the conversation regarding the loan father said: 'Now, Mr. Laws, you have always represented to me that you were going to take care of me'—I think 'take care of me' were the words probably used—'for the many services and labors that I have performed in your behalf, at your request, in helping you to push your contract for the construction of the Fairmont & Mannington Railroad Company line of road and for assuming obligation by way of indorsement in your behalf.' Mr. Laws said: 'Yes; I have. I told you that I would look-after you.' Father said: 'I think this is a good time to know what I am to get.' Mr. Laws said: 'Well, what do you want?' Father said: 'You were willing to give Mr. C. W. Watson $100,000 worth of stock to secure him a loan on my indorsement, and I think you ought to be more liberal in the way of stock to me for my services.' Mr. Laws said: 'Will you be satisfied with $100,000 worth of stock?' Father said: 'I think I ought to have $150,000 worth of stock of the Fairmont & Mannington Railroad Company.' Mr. Laws hesitated, and said that was a good deal. Father said that was what he wanted. Mr. Laws, without any further demurrer, said: 'I will give it to you.'"

The witness states that this was about 3 o'clock in the afternoon and the bank had closed; that the money was to be deposited to the credit of Mr. Laws the next day. He further testifies that he wrote the receipt for the bonds and inclosed it in a letter to Mr. Laws. This is the sole testimony throwing light upon the transaction. Accepting the valuation put upon the stock by the appellee at 30 cents on the dollar, the 1,500 shares were worth $45,000. In addition to this, he had, unincumbered, 28 bonds of the company. How much more does not appear. It is difficult to understand why, with this amount of valuable security, he was willing to give stock valued by him at $45,-000 as a bonus, or by way of usury for the loan of $18,000, and, as he insists, of an indorsement of $12,000 additional. The proposition upon its face is unreasonable. It may be, and we are inclined to think is probable, that he overestimated the value of the stock. It is manifest that neither of the appellants attached any considerable value to it. It is also worthy of note that, while the contract was made on October 10, 1908, the stock was not delivered until after Laws had met Fleming in Philadelphia some time in November or December, thus showing that appellee had ample time to consider the purport and effect of his agreement before he was called upon to execute it. This excludes any suggestion of an overreaching or driving a hard bargain. While it does not appear what other resources appellee had upon which to raise money, it does appear from his testimony that he held a majority of the stock in the railroad company. It is true that the testimony in regard to the extent and value of the services rendered by Fleming is not very satisfactory. It is also true that it does not appear that he had made any former demand for payment. The reasonableness of his demand for the transfer of the stock in payment of his services depends largely upon the value of the stock. If appellee's estimate is correct, it would seem that the demand was unreasonable, but his very slight demurrage, in connection with other tes-

timony in the record, raises a serious doubt as to the value of the stock. A. S. Fleming, secretary and treasurer of the company, says:

"I think that father got in payment for his services the 1,500 shares of stock, which was practically nothing—no pecuniary value. I considered the stock worth nothing and father did not. Had no market value at all. Father took that stock because he wanted voice in the management of the road, which that would give him, and for no other reason."

If this be correct, the demand for the transfer of the stock for services rendered was not unreasonable.

We have given the testimony a careful consideration and, because of the fact that we are unable to reach the conclusion of the learned judge below, have discussed it at more length than usual. Guided by the principle announced in Barcalow v. Sanderson, 17 N. J. Eq. 464, that, "while it is the duty of the court to maintain the law against usury and be careful to prevent its evasion by any shift, covin, device, contrivance, or deceit, we are not called upon to enforce its severe penalties without evidence entirely satisfactory and free from doubt," we are unable to reach the conclusion that the transfer of the stock was a device or shift to cover usurious interest."

The decree of the court below must be reversed.